UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 ------------------------------------------------------------------- X

| | |
|---|---|
| VANESSA WALSH, NINA CRAWFORD, SAMANTHA COLEMAN, MILTON CRUZ, LYDIA GONZALEZ DIAZ, MARYANNE HAYES, WILLIAM HEARN, FRANCISCO HERNANDEZ, GAIL JONES, MARC POLITE, RALPH WAITERS and LATRINA WILLIAMS, on behalf of a class of similarly situated tenants of the New York City Housing Authority | Case No. 21-cv-4872 |

Case No. 21-cv-4872

**VERIFIED CLASS
ACTION COMPLAINT**

Plaintiffs,

-against-

GREGORY RUSS, as Chairman of the NEW YORK
CITY HOUSING AUTHORITY,

Defendant.

 ------------------------------------------------------------------- X

## PRELIMINARY STATEMENT

1.      This is an action for injunctive relief addressed to the continued efforts by the New

York City Housing Authority ("NYCHA") to force their tenants into a program which would

require them to give up their leases with NYCHA and sign new leases with C & C Apartment

management Management LLC under a privatization program called Permanent Affordability

Commitment Together ("PACT"), which NYCHA asserts is authorized under a Federal program

called Rental Assistance Demonstration ("RAD"). This complaint asserts that the PACT program,

as implemented diminishes their rights as tenants, both under Federal Law and under various

Consent Decrees entered into involving mold, lead paint and generally with the U.S. Department

of Housing and Urban Development ("HUD"), without due process of law. Plaintiffs further

argue that given the imminent passage of legislation, by Congress, to fully fund all of NYCHA's

capital repair needs, at a price tag of $40 Billion, the demand that Plaintiffs and the class of

tenants they represent sign leases with a private developer/managing company and move from becoming tenants under Section 8 of the Housing and Community Development Act of 1978, instead of under Section 9 of the US Public Housing Act of 1937 is arbitrary and capricious.

2.      NYCHA was created in 1935 with a mission of providing decent, affordable housing for low- and moderate-income New York residents. Today, more than 400,000 New Yorkers reside in one of the 326 NYCHA housing developments in New York (the "NYCHA Developments").[1] Although the NYCHA Developments were built as models of affordable public housing, NYCHA has failed in its responsibilities to its Residents and allowed the NYCHA Developments to fall into disrepair, rendering such housing unsanitary, dangerous, and often uninhabitable. This is true of the buildings Plaintiffs live in.

3.      In failing to fulfill its mission to its Residents, NYCHA has flagrantly violated numerous contractual, statutory, and common law obligations that it owes to those Residents and subjected those Residents to deplorable living conditions. See generally the Court's opinion in *United States v NYCHA*, 347 F. Supp.3d 182 (SDNY 2018).

4.      The Plaintiffs here are residents of the Harlem River Houses in Manhattan who have suffered, and will continue to suffer, from NYCHA's failure to provide them with decent and sanitary housing, in complete breach of their Lease Agreements and in breach of the implied warranty of habitability.

5.      NYCHA has acknowledged that the various Consent Decrees which it has entered into, which grant relief to NYCHA tenants, do not apply to tenants of PACT/RAD developers/

---

[1] N.Y.C. Hous. Auth., About NYCHA, NYC.GOV, https://www1.nyc.gov/site/nycha/about/about-nycha.page (last visited April 2, 2021).

property managers. See, for example, Exhibit F, NYCHA Memo of Law opposing extension of Baez class action mold consent decree, at pages 6-8 and 11-16.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant 28 U.S.C. § 1331 because Plaintiffs allege claims that arise under federal law. Venue in this Court is proper pursuant to CPLR § 503(a) because the Plaintiffs reside in New York County, and because the events giving rise to the Plaintiffs' claims occurred in New York County.

7.      The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because Plaintiffs' state law claims arise from the same acts and transactions that give rise to Plaintiffs' federal claims.

## PARTIES

8.      Plaintiff VANESSA WALSH resides at 210N W. 153rd Street, Apt. 3B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

9.      Plaintiff NINA CRAWFORD resides at 70 Macombs Place, Apt. 1B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

10.      Plaintiff SAMANTHA COLEMAN resides at 2641 Adam Clayton Powell Blvd., Apt. 1B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

11.      Plaintiff MILTON CRUZ resides at 44 Macombs Place, Apt. 3C, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

12.      Plaintiff LYDIA GONZALEZ DIAZ resides at 211E W. 151st Street, Apt. 2A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

13.      Plaintiff MARYANNE HAYES resides at 46 Macombs Place, Apt. 1A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

14.    Plaintiff WILLIAM HEARN resides at 220 W. 152nd Street, Apt. 2B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

15.    Plaintiff FRANCISCO HERNANDEZ resides at 2850 Eighth Avenue, Apt. 6E, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

16.    Plaintiff GAIL JONES resides at 52 Macombs Place, Apt. 1A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

17.    Plaintiff MARC POLITE resides at 211D W. 151st Street, Apt. 3D, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

18.    Plaintiff RALPH WAITERS resides at 70 Macombs Place, Apt. 3A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

19.    Plaintiff LATRINA WILLIAMS resides at 181 W. 151st Street, Apt. 5C, New York, NY 10039, a part of the Harlem River NYCHA Housing Development.

20.    Defendant NEW YORK CITY HOUSING AUTHORITY (NYCHA) is a New York State Public Development Corporation, with its headquarters at 90 Church Street, New York, NY 10007, which exists under the Public Housing Law, which provides public housing in New York City under Section 9 of the US Public Housing Act of 1937. It was the first agency in the United States to provide housing for low- and moderate-income residents throughout the five boroughs of New York City. NYCHA also administers a citywide Leased Housing Program under Section 8 of the Housing and Community Development Act of 1978 involving rental apartments. These communities are often referred to in popular culture as "projects," or "developments." These include single and double family houses, apartment units, singular floors, and shared small building units. Greg Russ is sued in his capacity as Chairman of NYCHA.

21.    The New York City Housing Authority's mission is to increase opportunities for low- and moderate-income New Yorkers by providing safe, affordable housing and facilitating access to social and community services. More than 400,000 New Yorkers reside in NYCHA's 325 public housing developments across the City's five boroughs. Another 235,000 receive subsidized rental assistance in private homes through the NYCHA-administered Section 8 Leased Housing Program.

## FACTUAL ALLEGATIONS

### I.    NYCHA's Obligations to Its Residents

22.    NYCHA leases units in the NYCHA Developments to the Plaintiffs pursuant to the Lease Agreements,[2] which obligate NYCHA, as a landlord, to fulfill certain duties and responsibilities. Further, New York law—both statutory and common law—imposes additional obligations on landlords such as NYCHA. That NYCHA is a public agency does not immunize it in any way from the contractual terms and laws that apply to it as a landlord.

### A.    NYCHA's Lease Obligations to Its Residents

#### 1.    Specific Lease Agreement Provisions

23.    Under the express terms of its Lease Agreements with the Plaintiffs (see Lease Agreement annexed as Exhibit A), NYCHA has a number of contractual obligations to its Residents, including the obligation to "maintain in good and safe working order and condition electric, plumbing, sanitary, heating, ventilating, and other facilities, and appliances, including elevators, supplied by [NYCHA]." (Lease Agmt. § 12(e)) Other specific provisions of the Lease

---

[2] Citations to "Lease Agmt." refer to a representative Lease Agreement attached hereto as Exhibit A. Because NYCHA uses standard forms for its leases, all of the Lease Agreements signed by Plaintiffs have substantially identical terms.

Agreements also address NYCHA's contractual obligation to provide adequate plumbing and drainage, heat and hot water, safe and secure common areas, effective waste removal, gas, electricity and working appliances. (*See, e.g.*, Lease Agmt. §§ 10, 13)

24.     Further under §14 titled "Hazards to Life, Health or Safety, in the event that the Leased Premises is damaged to the extent that conditions are created which are hazardous to life, health, or safety of the occupants: (c) the Landlord shall offer standard alternative accommodations, if available, in circumstances where necessary repairs cannot be made within a reasonable time." (Lease Agmt. § 14) "In the event repairs are not made in accordance with (this section), rent shall abate during the period exceeding a reasonable time for repairs in which such repairs were not made." (Lease Agmt. § 14(d))

### 2.   Obligations Incorporated from Federal Law

25.     Further, NYCHA is subject to housing and safety standards promulgated by federal, state, and municipal authorities. Since NYCHA's operation of the NYCHA Developments is heavily subsidized by federal funding from the United States Department of Housing and Urban Development (HUD), NYCHA is required to comply with federal housing standards. Every year from 2015 to 2018, NYCHA received more than $1 billion in HUD funding, and in 2019, NYCHA received $994 million in HUD funding for its operating budget and $889 million for its capital program.

26.     Accordingly, NYCHA must comply with, among other things, HUD regulations setting forth standards for public housing (the "Housing Standards"), which require public housing to "be decent, safe, sanitary and in good repair" and set forth several criteria that public housing must meet to satisfy that requirement. *See* 24 C.F.R. § 5.703. Such criteria include, by example, a requirement that "[e]ach [NYCHA] building's domestic water, electrical system,

elevators, fire protection, HVAC, and sanitary system must be free of health and safety hazards, functionally adequate, operable, and in good repair." *Id.* § 5.703(d)(1).

27.    NYCHA is obligated to its tenants, under a Consent Decree with HUD entered into in 2018, to pursue a series of repairs and reforms to procedural scheduling and reporting of those repairs. That Consent Decree, though in effect, has not been approved by the Court in *United States v. NYC Housing Authority*, 18 Civ 5213 (SDNY, Pauley, J); see *United States v NYC Housing Authority*, 347 F. Supp3d 182 (SDNY 2018).

### 3.    Obligations Incorporated from State Law

28.    In addition, the Lease Agreements (and the Housing Standards (24 C.F.R. § 5.703(g)) also expressly require NYCHA "[t]o comply with all applicable laws, rules and regulations" of any "state . . .agencies." Such laws include New York's comprehensive Multiple Dwellings Law ("MDL").

### B.    NYCHA's Statutory and Common Law Obligations to its Residents

29.    In addition to the promises made in the Lease Agreements, NYCHA also has an obligation to provide the Plaintiffs with habitable dwellings under New York statutory law (N.Y. Real Prop. Law § 235-B) and common law precedent (*see, e.g.*, *Park W. Mgmt. Co.*, 47 N.Y.2d at 323-235).

## II.    NYCHA Has Breached Its Obligation to Provide Decent, Safe, and Sanitary Housing to Its Residents

30.    As noted above, NYCHA houses over 400,000 New Yorkers. Approximately 27 percent of Residents are children, nearly 20 percent are age 62 or older and more than 37,000 are both over 62 and live alone. Nonetheless, NYCHA has consistently failed in its obligations to provide adequate housing to its Residents, including the young and elderly. For example, New York State investigators sent to inspect a sample of 225 public housing apartments in March

2018 found that 212, more than 80 percent, had "at least one severe condition" that "could pose a health hazard" to those living there.[3] In October 2019, the Regional Planning Association—an independent non-profit group focused on improving living conditions in the New York metropolitan area—issued a report warning that NYCHA's "public housing has reached an unprecedented state of crisis" and was "nearly uninhabitable."[4]

31.     In 2018, the DOJ brought an action against NYCHA (the "DOJ Action"), asserting that "NYCHA[] violates basic health and safety regulations of [HUD]," which "require NYCHA to . . . provide residents decent, safe, and sanitary housing" and "repeatedly made false statements to HUD and the public regarding these issues and has deceived HUD inspectors."[5] At a news conference announcing the DOJ Action, United States Attorney Geoffrey Berman stated that NYCHA's "problems exist . . . because NYCHA was a dysfunctional operation and is fundamentally flawed and engaged in a culture of false statements and concealment."[6]

32.     Significantly, at a September 2018 hearing in the DOJ Action (at which dozens of Residents testified about their NYCHA living conditions), Judge William H. Pauley agreed with the DOJ, describing NYCHA's failure to provide adequate housing as "absolutely stunning."[7] The DOJ Action ultimately led to the appointment of a federal monitor (the "Federal Monitor"), who similarly noted that "NYCHA routinely failed to comply with lead-based paint safety regulations and failed to provide decent, safe, and sanitary housing with respect to the provision

---

[3] Yoav Gonen, *Beleaguered NYCHA Chair Shola Olatoye is Resigning*, N.Y. POST (Apr. 9, 2018), https://nypost.com/2018/04/09/nycha-chief-shola-olatoye-is-resigning.

[4] Reg'l Plan Ass'n, NYCHA's Crisis: A Matter for All New Yorkers (Dec. 2018), available at http://library.rpa.org/pdf/RPA-NYCHAs_Crisis_2018_12_18_.pdf.

[5] Compl., *United States v. N.Y.C. Hous. Auth.*, No. 18-cv-05213-WHP (S.D.N.Y. June 11, 2018), ECF No. 1, ¶ 1.

[6] Spectrum News NY1, *NYCHA Settlement Will Cost City $2B, Appoint a Federal Monitor*, NY1 NEWS (June 11, 2018), https://www.ny1.com/nyc/all-boroughs/news/2018/06/11/city- reaches-deal-on-nycha-settlement-terms.

[7] Sarina Trangle, NYCHA Residents Detail Horrid Living Conditions *Before Federal Judge* (Sept. 26, 2018), AM N.Y. (Sept. 26, 2018), https://www.amny.com/news/nycha-court-hearing- 1-21262062.

of heat, hot water, and elevators, and the control and treatment of mold and pests."[8] The Federal

Monitor further explained that problems with "lead paint, mold, heat/hot water, elevators, pests,

and waste management—share common causes that must be addressed for any individual

solution to be effective. NYCHA's housing stock is aging, and years of neglect have taken a

toll."[9] In 2019, New York Congresswoman Nydia Velazquez echoed these same sentiments,

stating "there's been local mismanagement of the agency throughout multiple mayoral

administrations . . . which saw a mushrooming of unfulfilled repair orders and the decision to

discontinue lead testing, from which we're seeing the tragic results today."[10]

33.    None of NYCHA's numerous breaches of its obligations was a secret. As the

Federal Monitor noted, "New York City and national news media have made numerous reports

over many years about the plight NYCHA residents faced with these deficient conditions."[11] For

example, in July 2018, the *New York Times* reported that "[p]ublic housing in New York City has

become synonymous with the dilapidated living conditions many of its more than 400,000

residents have endured in recent years."[12] Similarly, in December 2019, the *New York Post*

reported that tenants in two cases filed against NYCHA in Brooklyn Housing Court claimed "the

New York City Housing Authority is miserably failing to provide legally required safe and

decent housing" and quoted one resident who stated, "We are living as if it's a third world

---

[8] Bart M. Schwartz, Monitor's First Quarterly Report 23 (July 22, 2019) ("Monitor's First Report"), *available at* https://nychamonitor.com/wp-content/uploads/2019/07/NYCHA-First-Report-7.22.19.pdf.

[9] *Id.* at 23-24.

[10] Greg B. Smith, *How NYCHA Lead and Repairs Scams Started Under Mike Bloomberg's Mayoral Watch*, THE CITY (Dec. 16, 2019), https://thecity.nyc/2019/12/how-nycha-lead-repair-scams-started-under-mike-bloombergs-watch.html.

[11] Monitor's First Report at 23.

[12] Luis Ferre Sandurni, *The Rise and Fall of New York Public Housing: An Oral History*, N.Y. TIMES (July 8, 2019), https://www.nytimes.com/interactive/2018/06/25/nyregion/new-york-city- public-housing-history.html.

country."[13] That same month, New York City Public Advocate Jumaane Williams named NYCHA as the City's worst landlord for the second year in a row. He explained that NYCHA Developments have "bad [housing code] violations  They're things that you can't live there and be a human being."[14]

34.    While the Federal Monitor is charged with remedying the deplorable conditions in NYCHA Developments, the Director of Columbia Law School's Health Justice Advocacy Clinic has described the appointment of that Monitor as "the equivalent of nailing a 2-by-4 to a collapsing building." She further explained that "[t]he conditions of public housing in New York City are deplorable," and NYCHA is "[b]eset by lead-paint hazards, mold, heating failures, and chronic mismanagement" that pose "a danger to [NYCHA's] 400,000 residents."[15]

35.    On June 11, 2018, to resolve extensive and well-documented claims against it in the DOJ Action, NYCHA entered into a consent decree (the "Consent Decree") in which it admitted its responsibility for unsafe conditions in the NYCHA Developments and to making false statements about them to federal inspectors and the public. Among other things, NYCHA conceded:

- "At least once a year, beginning no later than 2010 and extending through 2016, NYCHA's certifications to HUD contained untrue representations that NYCHA 'will comply with' HUD's federal lead paint safety regulations."

---

[13] Jacob Henry & Rich Calder, *Tenants at Two Dilapidated NYCHA Complexes Sue Over Living Conditions*, N.Y. POST (Dec. 13, 2019), https://nypost.com/2019/12/13/tenants-at-two-dilapidated-nycha-complexes-sue-over-living-conditions.

[14] *Public Advocate Releases List of New York City's Worst Landlords*, NY1 NEWS (Dec. 16, 2019), https://www.ny1.com/nyc/all-boroughs/news/2019/12/16/public-advocate-releases-list-of- new-york-city-s-worst-landlords.

[15] Emily A. Benfer, *New York's Public Housing System is the Size of a City. It's Failing Children.*, WASH. POST (Feb. 11, 2019), https://www.washingtonpost.com/opinions/new-yorks- public-housing-system-is-the-size-of-a-city-its-failing-children/2019/02/11/458f63c2-2bb7-11e9- 984d-9b8fba003e81_story.html.

- "At least once a year, beginning no later than 2010 and extending through 2016, NYCHA's certifications to HUD contained untrue representations that NYCHA was 'in compliance with all applicable Federal statutory and regulatory requirements.'"

- "Since at least 2010, NYCHA has not performed most of the biennial lead paint risk assessment reevaluations required by regulation for developments containing lead paint. In a 2011 email, a NYCHA director advised a NYCHA executive that NYCHA was not conducting required risk assessment reevaluations."

- "Between 2011 and present, NYCHA residents have made many thousands of complaints about mold growth every year."

- "In many cases, NYCHA staff verified that the mold growth covered 10 or more square feet. In nearly 300 cases between 2014 and 2016, the verified mold growth covered more than 100 square feet."

- "Currently, after NYCHA has removed mold from apartments, the mold returns at least 30% of the time."

- "In 2016 alone, NYCHA experienced an average of more than 13 outages per elevator. The majority of NYCHA elevator buildings had at least one period with no functioning elevator service in 2016."

- "NYCHA's data reflects more than 260,000 work orders for cockroaches between 2013 and 2016. For the same period, there were more than 90,000 mouse work orders and nearly 36,000 rat work orders."

- "The number of work orders created for cockroaches nearly doubled between 2013 and 2016, and the number of apartments reporting mice and rat complaints has been increasing since 2013."

- "For a decade, NYCHA provided its staff with a list of 'Quick Fix Tips' to improve inspection scores. These Quick Fix Tips included replacing damaged ceiling tiles with 'painted cardboard,' covering broken fences with 2x4s painted black, and placing 'improperly stored flammables' 'out of sight' on the day of an inspection."

36.     Although in the Consent Decree NYCHA promised to remedy its breaches, harmful conditions continue to plague the NYCHA Developments. Recurring mold growth (which was supposed to be addressed in a separate Consent Decree in *Baez v NYC Housing Authority*, 13 Civ. 8916 (WHP)) continues to infect thousands of apartments because of leaks and poor ventilation, a particular health risk for Residents with asthma. Pest infestations remain common, fostered by NYCHA's failure to fix leaks, and provide basic sanitation. Elevators frequently fail to work, stranding elderly and disabled tenants. Incredibly, lead paint safety rules are still violated in the majority of NYCHA Developments. Leaks are common and peeling paint frequently goes unaddressed. NYCHA's own maintenance procedures often are not followed. Many categories of repairs that should be quickly addressed instead take weeks or, more often, months. In recent years, the New York City Department of Investigation ("DOI") has also found that NYCHA fails to properly conduct key safety checks of items like smoke and carbon monoxide detectors in its apartments, and the New York City Comptroller has found that the majority of NYCHA's playgrounds have "substandard and visibly hazardous conditions."

37.     NYCHA's breaches of its obligations have led Residents to resort to unsafe self-help by, among other things, scraping large mold patches from their bathroom ceilings and using potentially dangerous pesticides. They also climb unlit, hazardous stairwells when the elevators do not work.

38.     Specific failures by NYCHA to provide its Residents with decent, safe, and sanitary housing are described below:

A.    **NYCHA Has Failed to Repair and Maintain Plumbing Systems and to Adequately Remediate Mold and Mildew**

39.     Under the Lease Agreements, NYCHA is required to maintain plumbing and drainage systems that are in good and safe working order and are functionally adequate. (*See, e.g.*, Lease Agmt. § 12(e)) The Lease Agreements also require NYCHA to comply with the MDL, which provides that NYCHA, as the owner of the NYCHA Developments, must "keep clean at all times, and in good repair, the entire plumbing and drainage system including every water-closet, toilet and sink and every other plumbing fixture therein" of each NYCHA Development. MDL § 77(4).

40.     NYCHA continually fails to comply with these obligations, rendering NYCHA dwellings unsafe and uninhabitable. The water pipes in the NYCHA Developments are almost universally old and insufficient to handle the amount of water needed to properly service the Plaintiffs normal and daily needs. As a result, the water pipes frequently become clogged.

41.     In addition to becoming clogged, pipes also frequently leak. A March 2018 investigation of 255 NYCHA Developments by the New York State Department of Health (the "2018 DOH Investigation") found that 21% of the NYCHA Development units inspected had a "high severity water intrusion" defined as an active leak, a leak that has caused structural damage or a sewage leak. The investigators further found potential structural issues that appeared to have been caused by previous leaks that had never been properly addressed by NYCHA maintenance staff.[16]

---

[16] N.Y. State Dep't of Health, Assessment of New York City Housing Authority (NYCHA) Properties 9 (Mar. 2018) ("2018 DOH Investigation"), *available at* https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/FINAL_Assessment_ of_NYCHA_Report.pdf.

42.    Further, although Residents regularly report leaks to NYCHA and request repairs, NYCHA does not respond to the requests in a timely manner, when it responds at all. The Federal Monitor's first report, dated July 22, 2019 (the "Monitor's First Report"), noted that residents of the NYCHA Developments made "numerous complaints" about emergency requests for repairs, including "serious water leak[s]," that were "unaddressed for weeks or, in some cases, not at all."[17]

43.    Inevitably, the unaddressed leaks and resulting moisture cause mold. A survey conducted by the Red Hook Initiative in 2016 found that 94 percent of nearly 300 Residents surveyed currently had or previously had leaks and/or mold in their apartments. Nearly 40 percent of Residents who reported mold to NYCHA did not receive any response, and less than 16 percent of Residents who did receive a response described the outcome of that response as positive.[18]

44.    The Monitor's First Report—as well as the Federal Monitor's second report (the "Monitor's Second Report"), dated November 1, 2019—verify that these leak and mold problems continued through 2019. For the period from November 2018 through January 2019, 3,293 "7-day" mold work orders (reflecting major mold occurrences) were created and only 1,805 were closed. Of those closed, nearly one-third (31%) were not closed within seven days. During the same period, 3,960 "15-day" mold work orders (reflecting more minor mold occurrences) were created and only 1,006 were closed. Of those closed, one-third (33%) were not closed within 15 days.[19]

---

[17] Monitor's First Report at 78.

[18] Red Hook Initiative, The Impact of Mold on Red Hook NYCHA Tenants 13, 17 (2016), *available at* http://rhicenter.org/wp-content/uploads/2016/10/ImpactofMold_RHI_- FINALREPORT_10.27.16.pdf.

[19] Monitor's First Report at 44.

45.     The Monitor's Second Report also found that from May 1 to July 31, 2019, 10 percent of "7-day" mold work orders were not completed within seven days, and 43 percent of "15-day" mold work orders were not completed within 15 days.[20] The Monitor's Second Report also states that "[t]hough leadership at NYCHA has, for years, known of the scope of the mold problem, . . . [t]housands of NYCHA residents have long suffered and continue to suffer from the effects of mold and the lack of urgent, rigorous action by NYCHA" and concludes that "NYCHA is currently not using its best efforts and technically is in violation of the Revised Consent Decree in *Baez* [*v. N.Y.C. Hous. Auth.*, an action filed in 2013] and thus the HUD Agreement as it pertains to mold."[21]

46.     The Federal Monitor's third report, dated February 4, 2020 (the "Monitor's Third Report"), found that "NYCHA has a long way to go to effectively remediate mold in apartments and common areas" and that "the fundamental question of how NYCHA will apply adequate resources and methods to comply with the [HUD Settlement] Agreement and the *Baez* Consent Decree remains unanswered."[22]

47.     The Federal Monitor's fourth report, dated May 18, 2020 (the "Monitor's Fourth Report"), similarly found that "NYCHA continues to have serious problems with mold" and that that "for the quarter ending January 31, 2020, only 34% of "15-day" mold work orders were

---

[20] Bart M. Schwartz, Monitor's Second Quarterly Report 33-34 (November 1, 2019) ("Monitor's Second Report"), *available at* https://nychamonitor.com/wp-content/uploads/2019/11/NYCHA- Monitor-Second-Quarterly-Report-11.1.19-FINAL.pdf.

[21] *Id.* at 34, 36.

[22] Bart M. Schwartz, Monitor's Third Quarterly Report 5, 39 (Feb. 4, 2020) ("Monitor's Third Report"), *available at* https://nychamonitor.com/wp-content/uploads/2020/02/NYCHA-Monitor- Third-Quarterly-Report-2.4.20.pdf.

completed within 15 days. The Federal Monitor also warned that NYCHA'S "battle against mold" would likely "become[] complicated by the impact of the COVID crisis."[23]

48.     In his letter submitted in lieu of a Fifth Quarterly Report (the "Monitor's Fifth Report Letter"), the Federal Monitor confirmed that the NYCHA's problems with mold worsened during the COVID-19 pandemic. During the period from March 23 through June nearly half (45.5%) of "7-day" mold work orders were not completed within 7 days, and more than eight in ten (81.8%) "15-day" mold work orders were not completed within 15 days.[24]

49.     The presence of mold in the NYCHA Developments is also in violation of the Housing Standards, which provide that "dwelling units and common areas must have proper ventilation and be free of mold." 24 C.F.R. § 5.703(f). The NYC Housing Code similarly provides that NYCHA, as the owner of the NYCHA Developments, "shall take reasonable measures to keep the premises free from . . . indoor allergen hazards and from any condition conducive to indoor allergen hazards, and shall take reasonable measures to prevent the reasonably foreseeable occurrence of such conditions and shall take reasonable measures to expeditiously remediate such conditions and any underlying defect[.]" N.Y.C. Admin. Code § 27-2017.1.

50.     If and when NYCHA finally does attempt to repair leaks and remediate mold in the NYCHA Developments, the efforts are often inadequate. The Monitor's First Report found

---

[23] Bart M. Schwartz, Monitor's Fourth Quarterly Report 36, 38 (May 18, 2020) ("Monitor's Fourth Report"), *available at* https://nychamonitor.com/wp-content/uploads/2020/05/NYCHA- Monitor-Fourth-Quarterly-Report-5.18.20.pdf.

[24] Letter from Bart M. Schwartz 5 (Aug. 13, 2020) ("Monitor's Fifth Report Letter"), *available at* https://nychamonitor.com/wp-content/uploads/2020/08/8.13.20-Fifth-Quarterly-Report-Letter- Final.pdf.

that from November 2018 through January 2019, mold reoccurred in nearly half (47%) of reported cases for which mold work orders had been closed.[25]

51.    The recurrences of leaks and mold are due, in large part, to the fact that NYCHA's repairs do not address the underlying problems, such as poorly maintained and inadequate water pipes. As the Monitor's First Report explains, cutting and replacing sections of piping often simply moves the points at which water pressure builds and causes a leak farther down the pipe.[26] Problems with leaks and mold are also caused by the poor condition of roofs in the NYCHA Developments, including those in the Red Hook Developments in Brooklyn, which were severely damaged by Hurricane Sandy in 2012.[27] In 2017, NYCHA began the first phase of a post-Sandy reconstruction project planned to involve the installation of new roofs on all 28 buildings in the Red Hook Developments. However, many of the roofs have not been replaced, and the projected completion date for the first phase of the project has already been pushed back from 2021 to 2022.[28] In a July 2019 inspection of 35 roofs repaired by NYCHA, the New York City Comptroller found that more than half (54%) of the repairs had moderate or significant deficiencies that left the roofs "susceptible to water penetration and an accumulation of moisture under the roof line—an ideal condition for mold to grow."[29]

52.    The leaks, mold and other problems caused by the inadequate plumbing systems in the NYCHA Developments pose a significant risk to the Plaintiffs health and safety. When

---

[25] Monitor's First Report at 44.

[26] *Id.* at 45.

[27] *See* Sophie Kasakove & Tracie Williams, *Is New York City's Public Housing Ready for the Next Storm?*, THE NATION (Jan. 29, 2019), https://www.thenation.com/article/new-york-climate- change-public-housing ("Next Storm Article").

[28] *Id.*

[29] Marjorie Landa, City of N.Y. Office of the Comptroller, Audit Report on the New York City Housing Authority's Preventative Maintenance and Repairs on Roofs Under Warranty (July 29, 2019), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/SE18-059A.pdf.

mold grows in a home, it can release toxins and allergens linked to significant respiratory problems, including asthma attacks. Asthma is also a significant public health problem for adults in the NYCHA Developments. According to data from the New York City Department of Health ("NYC DOH"), between 2012 and 2014, the rate of asthma hospitalizations for NYCHA tenants aged 20 and above was four times higher than for the rest of New York City. Further, crumbling walls, caved-in ceilings and flooded floors from persistent leaks are certainly not within anyone's definition of "decent" housing as NYCHA is obligated to provide.

**B.      NYCHA Has Failed to Inspect for and Remediate Lead-Based Paint**

53.      Under the Housing Standards, which are expressly incorporated into the Lease Agreements, "housing must comply with all requirements related to the evaluation and reduction of lead-based paint hazards and have available proper certifications of such." 24 C.F.R. § 5.703(f). Further, HUD regulations regarding lead-based paint require that a lessor of residential property must, among other things, "disclose to the . . . lessee the presence of any known lead-based paint," 24 C.F.R. § 35.88(a)(2). HUD regulations also require public housing agencies to conduct lead-based paint inspections, *see id.* § 35.1115, and to abate all lead-based paint hazards identified in such an inspection. *See id.* § 35.1120.

54.      In addition, a provision of the NYC Housing Code known as N.Y.C. Local Law 1 of 2004 ("LL1") requires NYCHA, as the owner of the NYCHA Developments, to conduct an investigation of all units in which a child under age six resides if NYCHA "has actual knowledge of the presence of lead-based paint and in common areas" at least "once a year and more often if necessary," such as when "an occupant makes a complaint concerning a condition that is likely to cause a lead-based paint hazard or requests an inspection." N.Y.C. Admin. Code § 27-2056.4(a). The NYC Housing Code further requires that NYCHA "take action to prevent the reasonably foreseeable occurrence of . . . and shall expeditiously remediate" any lead-based paint

18

hazard, *id.* § 27-2056.3, and to comply with specified work practices when performing such remediation or performing other work that will "disturb more than one hundred square feet of lead-based paint or paint of unknown lead content" or "involve the removal of two or more windows with lead-based paint or paint of unknown lead content." *Id.* § 27-2056.11.

55.    Lead-based paint has long been a significant hazard for Residents in many NYCHA Developments, and yet in 2012, NYCHA breached its significant obligations regarding lead paint by *halting its annual inspections for lead.*[30] A September 2019 report of an investigation conducted by the New York City Comptroller states that between January 1, 2013 and October 10, 2018, 572 NYCHA buildings were not inspected by NYCHA.[31]

56.    Further, for years, NYCHA not only failed to complete the required lead inspections in the NYCHA Developments, but also knowingly and falsely certified to HUD and the public that it was compliant with federal, state, and local laws and performing lead paint inspections on NYCHA residences on an annual basis. On December 5, 2017, then-Chair of NYCHA Shola Olatoye ("Olatoye") made serious misrepresentations to the New York City Council about lead issues, and both Olatoye and the General Manager of NYCHA resigned from their positions in the wake of the public reckoning. Specifically, Olatoye testified to the City Council that all NYCHA lead inspectors conducting inspections of the 4,200 units with children under the age of six years were properly certified by HUD, and yet the DOI "discovered that none of the (lead paint) inspections were conducted by employees who NYCHA reported as having the HUD certification."

---

[30] Mark G. Peters, Comm'r of N.Y.C. Dep't of Investigation, Investigation into False Certification of NYCHA Lead Paint Inspections 3 (Nov. 2017) ("DOI Lead Paint Report"), *available at* https://www1.nyc.gov/assets/doi/press-releases/2017/nov/27NYCHALeadPaint11- 14-2017_UL.pdf.

[31] N.Y.C. Comptroller, N.Y.C. Comptroller Scott Stringer's Investigation into Child Lead Exposure 24 (Sept. 2019), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/Lead-Investigation.pdf ("Comptroller's Lead Report").

57.    NYCHA not only stopped conducting many required inspections, it also made misrepresentations about the inspections it actually did conduct when those inspections revealed significant lead exposure. NYCHA's own inspection data reveals that, of the 3,096 apartments inspected in the 2012 through early 2015 timeframe, 1,604 (52%) tested positive for lead and required abatement. At NYCHA's Red Hook Developments, NYCHA found lead paint in 105 out of 113 apartments—an astonishing 93 percent of all apartments tested. In 2016, NYCHA estimated that 55,000 of its apartments contained lead paint, including at least 10,000 housing children 6 years old or under.[32] In June of 2018, New York City Mayor Bill De Blasio ("De Blasio") revealed that the number could be nearly three times higher: up to 130,000 apartments, or 75 percent. This was in direct contradiction to De Blasio's 2017 statement to reporters: "I want to emphasize again, the universe [of dwellings containing lead paint] is not 175,000 apartments. It's 50,000 . . . that even have the possibility of having lead in them . . . that's fixed."[33]

58.    Eight hundred and twenty children living in NYCHA Developments over the period from 2012-2016 were tested and found to have dangerous levels of lead exposure,[34] and those were only the children tested. Given the pervasiveness of the toxic paint indicated by NYCHA's own inspection, the actual number of children who have been exposed is certainly much higher.

---

[32] Press Release, N.Y.C. Hous. Auth., Lead-Based Paint and New York City Housing Authority (NYCHA) Facts (June 12, 2016), *available at* https://www1.nyc.gov/assets/nycha/downloads/pdf/lead-based-paint-dohmh-nycha-20160612.pdf.

[33] *See* Rich Calder, *De Blasio Admits There Could Be Up to 130K Lead-Tainted NYCHA Apartments*, NEW YORK POST (July 9, 2018), https://nypost.com/2018/07/09/de-blasio-admits- there-could-be-up-to-130k-lead-tainted-nycha-apartments.

[34] Nolan Hicks, *Officials Found Elevated Lead Levels in Up To 820 Children—But Didn't Follow Up*, N.Y. DAILY NEWS (July 1, 2018), https://nypost.com/2018/07/01/officials-found- elevated-lead-levels-in-hundreds-of-children-but-didnt-follow-up.

59.     Ultimately, the DOI conducted an in-depth investigation of NYCHA's practices related to lead paint exposure. On November 14, 2017, it published the resulting report, which made NYCHA's failure to keep its residents safe from lead poisoning public knowledge.[35] As noted above, in the June 2018 Consent Decree, NYCHA admitted that "[s]ince at least 2010, NYCHA has not performed most of the biennial lead paint risk assessment reevaluations required by regulation for developments containing lead paint."

60.     While NYCHA is hiding and dissembling, Residents exposed to lead due to NYCHA's malfeasance are risking devastating damage to their brains and vital organs. For example, NYCHA allowed a family with an infant daughter to move into a unit it knew, but did not reveal, contained dangerous levels of lead paint, and by the time the child was 2 years old, a blood test revealed she had 5.6 micrograms of lead per deciliter—no amount is safe, and 5 micrograms is toxic.[36] As another example, a young girl who lives in a NYCHA Development was recently awarded $57 million because exposure to lead caused her blood-lead levels to reach 9 times the acceptable amount, resulting in serious developmental delays.[37]

61.     The Comptroller's report explains that New York City's Department of Housing, Preservation & Development ("HPD") does not receive or respond to complaints made by Residents through the public service number 311. Instead, 311 operators routinely route such complaints to NYCHA. Except in rare cases when HPD is directed by a Brooklyn Housing Court

---

[35] N.Y.C. Dep't of Investigation, DOI Investigation Reveals NYCHA Failed to Conduct Mandatory Lead Paint Safety Inspections for Four Years (Nov. 14, 2017), *available at* https://www1.nyc.gov/assets/doi/press-releases/2017/nov/27NYCHALeadPaint11-14- 2017_UL.pdf.

[36] *See* Molly Crane-Newman & Greg B. Smith, *NYCHA Let Children Live in Homes They Knew Were Toxic From Lead Paint as Young Residents Are Beset by Disabilities*, N.Y. DAILY NEWS (Dec. 26, 2017), http://www.nydailynews.com/new-york/nycha-children-live-homes-knew-toxic- article-1.3722174.

[37] *Family Awarded $57M After Jury Finds NYCHA Responsible for High Lead Levels in Girl's Bloodstream*, NY1 NEWS, https://www.ny1.com/nyc/all-boroughs/news/2018/01/29/family- awarded--57m-after-jury-finds-nycha-responsible-for-high-lead-levels-in-girl-s-bloodstream.

order to respond to lead paint complaints, the responsibility for responding to those complaints is left to NYCHA. Thus, the report concludes, "NYCHA was allowed to police its own compliance with LL1."[38]

62.     Although NYCHA claims that it is now testing for lead, it is clear that additional testing and abatement is needed. As of July 29, 2019, NYCHA had identified 46,372 units in the NYCHA Developments built before 1978 in which a child under six was known to reside and conducted visual assessments of 44,387 units. The assessments found that 39,596—nearly 90 percent—of the units had "Identified Deficiencies," which required NYCHA to perform interim control work to reduce the Residents' risk of exposure to lead-based paint. NYCHA has not performed any interim control work in more than two-thirds (68%) of the units it identified.[39] Further, as of October 31, 2019, NYCHA had conducted X-ray Fluorescence ("XRF") testing in less than 15 percent of the total 134,084 units in the NYCHA Developments built before 1978. NYCHA has not released the test results for nearly half (46%) of the units that have been tested, and yet nearly three in five (58%) of the units for which NYCHA has released results tested positive for lead.[40]

63.     The Monitor's Second Report notes that XRF testing is "significantly behind NYCHA's publicized schedule for completion (by the end of 2020)" and that the Federal Monitor "continue[s] to believe that inadequate resources are being applied to XRF testing and that NYCHA must use better methods to identify locations where children under six reside or regularly visit."[41]

---

[38] Comptroller's Lead Report at 24-25.

[39] Monitor's Second Report, App'x 4 at 12-13.

[40] Lead-Based Paint Report: XRF Testing Initiative, N.Y.C. HOUS. AUTH., *available at* https://my.nycha.info/PublicSite/Transparency/XrfReport (last visited Nov. 6, 2019).

[41] Monitor's Second Report at 24, 25 n.3.

64.     It is clear that such identification and testing is necessary, because in the period from August through October 2019 alone, NYCHA notified HUD of 28 children who live in NYCHA Developments with elevated blood lead levels.[42] In addition to requiring public housing agencies to test for lead, federal regulations also require housing agencies to follow work practices set forth in the Renovation, Repair, and Painting Rule ("RRP Rule") to reduce the risk of lead exposure during renovation work. *See* 40 C.F.R. § 745.85. And yet, the Monitor's First Report found that "adherence to the [RRP] [R]ule has not been uniform nor has it been strictly enforced or supervised by NYCHA," that "the norm was that some violation of the [RRP] Rule would occur in all jobs," and that "NYCHA lacks a comprehensive policy to address the many issues surrounding lead-based paint."[43]

65.     Further, the Monitor's Second Report found that NYCHA was still "not in compliance with lead-based paint regulations and many required lead safe work practices" and that "broad IT improvements must be made by NYCHA to bolster necessary record keeping for work that must comply with lead-based paint regulations."[44] Among other things, the Federal Monitor noted that the "current method of 'signing in' contractors and their teams via day books (with little to no information about the actual composition and credentials of their teams recorded at many [NYCHA D]evelopments) is clearly insufficient to meet NYCHA's critical need for reliable and efficient record keeping."[45]

66.     In a July 31, 2019 report to the Federal Monitor submitted in connection with its certification to HUD, NYCHA acknowledged that its practices have "not resulted in timely

---

[42] *Id.* at 31.

[43] Monitor's First Report at 33.

[44] *Id.*; Monitor's Second Report at 4.

[45] Monitor's Second Report at 29.

clearance examinations," and that "many sites have not received any clearance examination as required." NYCHA further stated that "[t]he number of units with no clearance examinations since the Summer of 2018 following either RRP or Interim Control work is 12,046."[46] In September 2019, NYCHA was only able to document timely collection of dust wipe samples approximately 71% of the time.[47]

67.    In the Monitor's Third Report, the Federal Monitor noted that only about 20% of apartments that NYCHA identified that needed to be tested for lead-based paint had been tested, and 55% of the apartments tested were positive. The Federal Monitor also found that, as of February 20, 2020, NYCHA was "unable to ensure that next-day clearance is obtained (or even that wipes are taken within 48 hours), and no protection or temporary housing is given to residents before clearance is obtained."[48]

68.    The Monitor's Fifth Report Letter found that NYCHA has "accrued a significant backlog of lead paint corrective work in apartments which must be addressed" and "NYCHA continues to face a great challenge in the timely and successful performance of dust wipes necessary to clear apartments for safe occupancy after lead paint work is completed."[49]

69.    The Federal Monitor also noted that "[a]lthough no key HUD Agreement deadlines relating to lead came due in the past quarter, future deadlines are at great risk of noncompliance."[50]

---

[46] *Id.* at 27 n.5 & App'x 4 at 25.

[47] *Id.* at 2.

[48] Monitor's Third Report at 29-30.

[49] Monitor's Fifth Report Letter at 5.

[50] *Id.*

70.     On October 22, 2020, the Federal Monitor released a statement revealing that there was a "significantly larger number of apartments where children under six reside who might be exposed to lead risks" than previously believed. The Federal Monitor explained that "as a result of its dialogue with residents during in-apartment XRF testing visits, and NYCHA's 'door knocking' campaign, through which NYCHA directly engages residents," NYCHA "identified a significantly larger number of apartments where children under six reside who might be exposed to lead risks. Approximately 6,000 apartments have been added to the count available two years ago, which was around 3,000 based on an annual certification process."[51]

71.     NYCHA's failure to comply with state and federal regulations regarding lead-based paint poses a significant risk to the Plaintiffs health and safety.

C.     **NYCHA Has Failed to Repair and Maintain Working Drainage and Sewage Systems**

72.     The drainage systems in the NYCHA Developments suffer from problems similar to those that plague the plumbing systems. The drainage systems are old and inadequate to meet the Plaintiffs' needs, and, in failing to repair and maintain the drainage and sewage systems, NYCHA is in violation of Section 12(e) of the Lease Agreements and Section 77(4) of the MDL.

73.     The Monitor's First Report noted that in the Polo Grounds Towers Development in Manhattan, a large pipe was "cascading putrid liquid." Several work orders were entered into NYCHA's database reporting the problem, but at least one of the work orders was closed without explanation, and a worker mopping up the liquid told the Federal Monitor that the problem had

---

[51] Press Release, NYCHA's Efforts to Locate Child Under Six in Apartments That May Contain Lead Paint (Oct. 22, 2020), *available at* https://nychamonitor.com/nychas-efforts-to-locate- children-under-six-in-apartments-that-may-contain-lead-paint.

not been repaired for more than two months. When the Federal Monitor's investigative team alerted NYCHA's senior management, the problem was repaired within three hours.[52]

74.    Residents at the Baruch Development in Manhattan regularly have problems with sewage flooding into their bathrooms. Although NYCHA has responded to some of their requests for repairs, those repairs have not been effective in remedying the problem.[53]

75.    When NYCHA does make repairs to the drainage systems, the repairs are inadequate, because they do not address the underlying problem—the fact that the drainage system cannot meet the needs of all NYCHA Development units. As with the water pipes, repairing one section of a damaged sewer pipe often simply causes the pressure to build up at another point further down the pipe. The unsanitary conditions caused by the sewage systems in the NYCHA Developments pose a significant risk to the Plaintiffs health and safety.

### D.    NYCHA Has Failed to Repair and Maintain Electrical Systems

76.    Pursuant to the Lease Agreements, NYCHA must "maintain in good and safe working order and condition electric . . . facilities and appliances . . . supplied by [NYCHA]." (Lease Agmt. § 12(e)) The Lease Agreements also require NYCHA to comply with the Housing Standards, which provide that "[e]ach building's . . . electrical system . . . must be free of health and safety hazards, functionally adequate, operable, and in good repair," 24 C.F.R. § 5.703(d)(1), as well as the NYC Housing Code, which requires NYCHA to "equip every dwelling for lighting by electricity" and to provide lighting in "public hallways, stairs, fire stairs, and fire towers" and "common laundry rooms" as well as "near the outside of the front entrance way of the building" and in "every yard and court." N.Y.C. Admin. Code §§ 27-2037, 27-2038(a), 27-2040. Finally,

---

[52] Monitor's First Report at 7.

[53] *Sewage Backs Up into Apartment at NYCHA Complex*, FOX 5 NEW YORK NEWS (June 25, 2019), https://www.fox5ny.com/news/sewage-backs-up-into-apartment-at-nycha-complex.

the Lease Agreements also require NYCHA to comply with the MDL, which requires NYCHA to "install and maintain a light or lights outside of the front- entrance way of the building[s]" providing specified amounts of illumination, and to provide a light or lights of specified illumination in "every vestibule and entrance hall in every public hall, stair, fire-stair and fire-tower on every floor" and, if necessary, to provide lighting "sufficient to permit a person to read the names on a mail box or other receptacle for mail." MDL §§ 35, 37.

77.     However, the electrical systems in the NYCHA Developments are not in good and safe working order or repair, and electrical outages are common. For example, in April 2018, the transformer burned out in the Andrew Jackson Houses Development in the Bronx. In November 2018, residents were still relying on backup generators, which failed on a near-daily basis. On at least one occasion, there were four power outages in a single day.[54]

78.     In July 2019, another transformer fire in the Andrew Jackson Houses Development caused two electrical outages within two days. The outages left at least 125 units without air conditioning or water in the middle of summer.[55] A month later, the Andrew Jackson Houses Development was still using backup generators."[56]

79.     Residents often experience electrical problems in their individual apartments. The 2018 DOH Investigation found that over 17 percent of the inspected units had electrical

---

[54] *See* Gaspard Le Dem, *Power Outages Plague Exasperated NYCHA Residents*, CITY LIMITS BLOG (Nov. 9, 2018), https://citylimits.org/2018/11/09/power-outages-plague-exasperated- nycha-residents.

[55] Mark Sundstrom & Katie Corrado, *Power Restored After Second Outage at Bronx NYCHA Building Left Dozens in the Dark*, PIX 11 NEWS, https://pix11.com/2019/07/12/power-restored- after-second-outage-at-bronx-nycha-building-left-dozens-in-the-dark.

[56] Nolan Hicks & Elizabeth Rosner, *Bronx NYCHA Complex Has Been Depending on Generators for a Month*, N.Y. POST (Aug. 14, 2019), https://nypost.com/2019/08/14/bronx- nycha-complex-has-been-depending-on-generators-for-a-month.

problems and noted that tenants commonly reported electrical outlets in their units were inoperable. *Id.* at 8.

80.     When NYCHA does make electrical repairs, it does not do so in a timely manner, if it responds at all. Moreover, the repairs NYCHA makes are temporary and do not fix the underlying problem, which is that the electrical systems in the NYCHA Developments are old and should be replaced.[57] Electrical outages that leave the NYCHA Developments without air conditioning and water pose a significant risk to the Plaintiffs health and safety, especially during the hot summer months. Further, faulty electrical systems, faulty outlets, fuse boxes and circuit breakers pose additional health and safety risks to the Plaintiffs and prospective Class Members, including the fact that such issues are serious fire hazards.

### E.      NYCHA Has Failed to Repair and Maintain Operative, Safe and Clean Elevator Systems

81.     Under the Lease Agreements, NYCHA must "maintain in good and safe working order and condition . . . elevators, supplied by [NYCHA]." (Lease Agmt. § 12(e)) Additionally, the Lease Agreements require NYCHA to comply with the Housing Standards, which provide that "[e]ach building's . . . elevators . . . must be free of health and safety hazards, functionally adequate, operable, and in good repair." 24 C.F.R. § 5.703(d)(1). Finally, pursuant to the Lease Agreements, NYCHA is required to comply with the MDL, which provides that dwellings that exceed six stories or sixty feet in height "shall be equipped with one or more passenger elevators, *operative at all times*, at least one of which shall be accessible to every apartment above the entrance story." MDL § 51(6) (emphasis added). NYCHA repeatedly fails to abide by these obligations.

---

[57] *See, e.g.*, Kelly Mena, *Tenants of NYCHA's Red Hook Houses Get Federal Attention*, BROOKLYN DAILY EAGLE (Aug. 27, 2019), https://brooklyneagle.com/articles/2019/08/27/nycha- red-hook-houses-hud-visit.

82.     For example, in 2016, an 84-year-old man died from injuries suffered while attempting to use an elevator in the Pelham Parkway Development. A subsequent investigation by the DOI found that a "brake monitor" safety device on the elevator was broken and may have prevented the accident if it had been functioning properly. The investigation found that more than 7 percent of all brake monitors installed in all NYCHA Developments were not functioning properly.[58]

83.     As a result of its investigation, the DOI made 14 specific recommendations to NYCHA to enhance its elevator maintenance protocols, improve its response to complaints about malfunctioning elevators and enhance safety.[59] However, problems with elevators have continued.

84.     In July 2019, an elevator outage at 154 West 84th Street in Manhattan lasted for nearly two weeks, trapping several residents who use wheelchairs in their apartments.[60] Further, a September 2019 investigation by local news agency NY1 found that between 2012 and 2018, the number of elevator outages in the NYCHA Developments increased by more than 16 percent. Across all of the NYCHA Developments, the outages lasted an average of 12 hours. In the Mitchel Development in the Bronx, which had the greatest number of outages, the outages lasted an average of 22 hours.[61]

---

[58] Mark G. Peters, Comm'r of N.Y.C. Dep't of Investigation, Elevator-Related Accidents and Fatality at NYCHA Public Housing 1, 3, 5 (Mar. 2016), *available at* https://www1.nyc.gov/assets/doi/reports/pdf/2016/2016-03-29-Pr08nychaelevator.pdf.

[59] *Id.* at 11-14.

[60] Nolan Hicks & Olivia Bensimon, *Elderly NYCHA Tenants Trapped in their Homes for 13 Days Because of Elevator*, N.Y. POST (July 19, 2019), https://nypost.com/2019/07/19/elderly- nycha-tenants-trapped-in-their-homes-for-13-days-because-of-elevator.

[61] Courtney Gross, *Out of Service: NY1 Investigation Finds Chronic Elevator Outages Plague NYCHA*, NY1 NEWS (Sept. 3, 2019), https://www.ny1.com/nyc/all- boroughs/politics/2019/09/03/out-of-service--ny1-investigation-finds-chronic-elevator-outages- plague-nycha.

85.     At a September 4, 2019 New York City Council Hearing (the "September 2019 Hearing"), NYCHA's Senior Vice President for Operations Support Services, Joey Koch ("Koch"), testified that from January through August 2019, there were 28,400 elevator outages across all of the NYCHA Developments. Koch further testified that NYCHA has received at least 11,000 notices of elevator violations from the New York Department of Buildings ("DOB") during 2019.[62]

86.     At the September 2019 Hearing, Koch also acknowledged that NYCHA's elevator inspection and repair unit is "very resource-challenged." It has only ten certified elevator inspectors and 40 licensed elevator mechanics.[63] In fact, on the day of the September 2019 Hearing, it took Koch more than an hour and a half to obtain information as to how many elevators were currently out of service. When New York City Council Member Alicka Ampry-Samuel noted that the information Koch provided did not appear consistent with the information that was on NYCHA's website, Koch stated that the report she was referring to "might be stale."[64]

87.     The Monitor's First Report found that this "significant shortage of [elevator] maintenance workers," coupled with the fact that "the existing NYCHA elevator portfolio is largely beyond its expected lifespan and/or otherwise in poor working condition" make "[i]mmediate improvements in NYCHA elevator service . . . unlikely."[65] Further, the Monitor's Second Report noted that NYCHA has plans to use funds allocated to NYCHA from New York

---

[62] Transcript of the Minutes of the New York City Council Committee on Public Housing Jointly with the Committee on Mental Health, Disabilities, and Addictions, dated Sept. 4, 2019 ("Sept. 2019 Tr.") at 13:7-11, 119:14-19, 137:2-14.

[63] *Id.* at 71:12-13, 151:4-6.

[64] *Id*. at 63:18-22, 75:2-22.

[65] Monitor's First Report at 52.

State to fund the installation of 148 elevators in 10 NYCHA Developments. However, the HUD

Agreement requires NYCHA to replace 297 elevators by 2025. That Report also found that aside

from "the usual challenges of funding, there are broader challenges that make it questionable

whether NYCHA can install 297 elevators in the next five years," such as the fact that "NYCHA

may be unable to acquire the necessary items or the labor for the installation within that

timeframe due to market limitations."[66]

88.    NYCHA's contemplated elevator replacements appear unlikely to remediate all of

the problems with the elevators in the NYCHA Developments. There are more than 3,200

elevators in the NYCHA Developments, and at the September 2019 Hearing, Brian Honan,

NYCHA's Director of the Office of Intergovernmental Relations, testified that more than two-

thirds of the elevators are in fair or poor condition and, as such, likely to need repairs or

replacement in the future.[67]

89.    The Monitor's Fifth Report Letter noted that "NYCHA's 3200 elevators are some

of the Authority's poorest performing assets, because so many are *still* in operation well past

their intended lifespan" and that NYCHA's elevator department "typically make[s] multiple

repair visits before finally correcting the root cause problem underlying the elevator breakdown,"

creating "increased total outage times and inefficient use of . . . staff who must keep responding

to these same elevators."[68]

90.    The elevator outages are also exacerbated by problems with the plumbing and

electrical systems in the NYCHA Developments. As Koch explained at the September 2019

Hearing, on some occasions, roof leaks have resulted in the accumulation of water in the elevator

---

[66] Monitor's Second Report at 43.

[67] Sept. 2019 Tr. at 115:18-21, 132:3-15.

[68] Monitor's Fifth Report Letter at 4.

shafts that caused outages. On other occasions, Con Edison reduces the voltage of electricity in

the NYCHA Developments while performing maintenance work, leaving the buildings with

insufficient electricity to power the elevators.[69]

91.    NYCHA's failure to repair the elevator systems in the NYCHA Developments

poses a significant health and safety risk to the Plaintiffs and prospective Class Members.

**F.    NYCHA Has Failed to Maintain Safe and Secure Premises**

92.    Under the Lease Agreements, NYCHA has an obligation "[t]o maintain the

common areas of the [NYCHA] Development[s] in a decent, safe, and sanitary condition" and

"[t]o keep the [NYCHA] Development buildings, facilities and common areas . . . in a clean and

safe condition." (Lease Agmt. §§ 13(a), (d)) Additionally, the Lease Agreements require

NYCHA to comply with the Housing Standards, which provide that "common areas must be

structurally sound, secure, and functionally adequate" and that "halls, corridors, [and] stairs must

be . . . free of health and safety hazards, operable, and in good repair;" and "[e]ach dwelling unit

within a building . . . must be structurally sound, habitable, and in good repair" and "[a]ll areas

and aspects of the dwelling unit, including the floors . . . walls, and windows[] must be free of

health and safety hazards, functionally adequate, operable, and in good repair." 24 C.F.R.

§ 5.703(d)(1) and (e). Further, under the NYC Housing Code, NYCHA must "provide a key lock

in the entrance door to each dwelling unit" and equip each door of a dwelling unit with a chain

door guard. N.Y.C. Admin. Code § 27-2043.

93.    The Lease Agreements also require NYCHA to comply with the MDL, which

provides that each street-level entrance to a multiple dwelling "shall be equipped with one or

more automatic self-locking doors," which "shall be locked at all times except when an attendant

---

[69] Sept. 2019 Tr. at 69:11-24.

shall actually be on duty." MDL §§ 50-a(1), (3). The MDL further provides that every multiple

dwelling with eight or more apartments "shall be equipped with an intercommunication system .

. . located at an automatic self-locking door giving public access to the main entrance hall or

lobby," which "shall consist of a device or devices for voice communication between the

occupant of each apartment and a person outside said door to the main entrance hall or lobby and

to permit such apartment occupant to release the locking mechanism of said door from the

apartment." *Id.* §§ 50-a(2)-(3).

94.    Once again, NYCHA has repeatedly failed to ensure that common areas are in

good repair, stairs are safe and that doors have locks that are secure. A 2018 audit of 299

NYCHA Developments by the New York City Comptroller found that nearly two-thirds (65%)

had unsecured doors. Further, roughly one in five of the NYCHA Developments audited were

also "severely vulnerable," with over half of their entrance doors unlocked. Additionally, nearly

half (47%) of the NYCHA Developments did not have security cameras near their front

entrances.[70]

95.    Although the audit recommended that NYCHA take steps to improve security at

the NYCHA Developments, these problems have persisted. As of June 2019, more than a third

(34%) of the NYCHA Developments did not have any security cameras.[71] Further, the cameras

that have been installed in other NYCHA Developments have a life expectancy of approximately

ten years, and some of the cameras were installed twenty years ago. At the June 2019 Hearing,

when asked directly how many of the security cameras in the NYCHA Developments are

---

[70] Press Release, N.Y.C. Office of the Comptroller, Stringer Releases Investigative Survey of NYCHA Doors (Oct. 12, 2018), *available at* https://comptroller.nyc.gov/newsroom/stringer- releases-investigative-survey-of-nycha-doors.

[71] Transcript of the Minutes of the New York City Council Committee on Public Housing Jointly with the Committee on Public Safety, dated June 6, 2019 ("June 2019 Tr.") at 51:8-11.

currently operational, Carolyn Jasper ("Jasper"), NYCHA's Vice President of Public Housing Operations, stated that she could not say, and admitted that NYCHA had not recently conducted a survey to determine how many, if any, of the cameras were functioning.[72] Jasper also testified that, as of May 31, 2019, there were nearly 2,600 open work orders requesting repairs to broken doors in building entrances, exits and common areas.[73]

96.    During a June 2019 City Council hearing (the "June 2019 Hearing"), the president of the tenants' association at 1325 Franklin Avenue (Claremont Houses) in the Bronx provided the City Council with a picture of an exterior door with tape on its door lock and testified that the door had been broken for more than two years. She further testified that as a result of the broken door, "we have the homeless coming and using the stairways as public bathrooms," and that, in one incident, a homeless man choked a senior citizen in the building.[74]

97.    Also at the June 2019 Hearing, Jasper testified that the property managers and/or superintendents of the buildings in each of the NYCHA Developments are responsible for inspecting doors on a daily basis and putting in work orders for doors that are broken. However, Raymond Rodriguez, NYCHA's Director of the Office of Safety and Security, stated that he could not verify whether the daily inspections were actually being performed or whether property managers were putting in work orders.[75]

98.    The broken or missing locks, intercoms, and security cameras in the NYCHA Developments expose the Plaintiffs and prospective Class Members to a significant and foreseeable risk of criminal conduct by third parties, including, but not limited, to criminal

---

[72] *Id.* at 50:13-51:19.

[73] *Id.* at 68:9-18.

[74] *Id.* at 20:2-25.

[75] *Id.* at 64:3-19, 65:23-66:17.

trespass. In 2018, there were 979 arrests for criminal trespass in the NYCHA Developments and 5,671 arrests for index crimes (which include murder, rape, robbery, aggravated assault, burglary, larceny, and motor vehicle theft).[76]

### G.    NYCHA Has Failed to Repair and Maintain Smoke and Carbon Monoxide Detectors

99.    Under the Housing Standards, smoke detectors in common areas must be "operable and in good repair," and each "dwelling unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit." 24 C.F.R. §§ 5.703(d)(4), (e). Likewise, the MDL provides that NYCHA must "equip each apartment . . . with approved and operational smoke detecting devices." MDL § 68(2)(a).

100.    Under the NYC Housing Code, NYCHA must "[p]rovide and install one or more approved and operational smoke detecting devices in each dwelling unit" and periodically replace such a device "upon the expiration of its useful life." N.Y.C. Admin. Code § 27-2045. NYCHA must also "provide and install one or more approved and operational carbon monoxide detecting devices in each dwelling unit and replace such devices" upon the expiration of their useful lives. N.Y.C. Admin. Code § 27-2045(1)(b)(1).

101.    After a fire in the Butler Houses killed two young children, the DOI conducted an investigation of NYCHA's safety inspection practices in which the DOI re-inspected 240 apartments in five NYCHA Developments that had recently been inspected by maintenance workers. In total, more than half (53%) of the apartments had deficiencies in critical safety items,

---

[76] *Id.* at 71:24-72:3, 83:11-14.

including numerous missing smoke and carbon monoxide detectors and missing or damaged fire safety notices.[77]

102.    The DOI's investigation also found that original work orders for 104 of the 236 apartments that were inspected could not be located. In more than a quarter (29%) of the 136 inspections for which original work orders were available, NYCHA maintenance staff had failed to report that smoke or carbon monoxide detectors were missing, damaged or broken. Work orders for nearly a third of the apartments (30%) visited immediately following safety checks inaccurately reported that broken smoke and carbon monoxide detectors were functioning.[78]

103.    At the conclusion of its investigation, DOI made five recommendations for changes to NYCHA's safety practices. Although NYCHA purported to accept the recommendations, problems with smoke and carbon monoxide detectors have continued. The 2018 DOH Investigation found that one in five inspected apartments had smoke and/or carbon monoxide detectors that were broken, had a low battery or were improperly located.[79]

104.    NYCHA's failure to install and repair smoke and carbon monoxide detectors in both individual units and in common areas poses a significant risk to the Plaintiffs health and safety.

H.    **NYCHA Has Failed to Remediate Problems with Pests**

105.    The Lease Agreements require NYCHA to comply with the Housing Standards, which provide that common areas must have "no evidence of infestation by rats, mice, or other

---

[77] Mark G. Peters, Comm'r of N.Y.C. Dep't of Investigation, Smoke Alarm and Other Safety Deficiencies in NYCHA Public Housing: Routine Neglect of Safety Rules and Falsification of Documents by NYCHA Maintenance Staff (Oct. 2016), *available at* https://www1.nyc.gov/assets/doi/press-releases/2016/oct/31NYCHA_Smoke_Detectors_10-04-16.pdf.

[78] *Id.* at 5-6.

[79] 2018 DOH Investigation at 7.

vermin." 24 C.F.R. § 5.703(f). The Lease Agreements also require NYCHA to comply with the NYC Housing Code, which provides that NYCHA "shall keep the premises free from pests[.]" N.Y.C. Admin. Code § 27-2017.1. The NYC Housing Code further states that "the presence of cockroaches, mice or rats in any room in a dwelling unit in a multiple dwelling or a common area shall constitute an immediately hazardous violation of this code[.]" *Id.* § 27-2017.4(b).

106.    To eradicate pest problems, NYCHA must: "1. inspect for, and physically remove pest nests, waste, and other debris by High-Efficiency Particulate Air (HEPA) vacuuming, washing surfaces, or otherwise collecting and discarding such debris; 2. eliminate points of entry and passage for pests by repairing and sealing any holes, gaps or cracks in walls, ceilings, floors, molding, base boards . . . [and a]ttach door sweeps to any door leading to a hallway, basement, or outside the building to reduce gaps to no more than one-quarter inch; and eliminate sources of water for pests by repairing drains, faucets, and other plumbing materials that accumulate water or leak [and r]emove and replace saturated materials in interior walls." *Id.* § 27-2017.8(a).

107.    NYCHA repeatedly violates these obligations. For example, the 2018 DOH Investigation found that nearly half (47%) of inspected units contained insect infestations and nearly one in five (17%) contained evidence of rodents. The investigation further found that nearly one-third (30%) of the units inspected contained severe issues with walls or flooring and noted that such issues could provide a potential route of entry for insects and rodents.[80]

108.    More recently, the Monitor's Second Report found that NYCHA failed to comply with a provision of the Consent Decree requiring NYCHA to use Integrated Pest Management ("IPM") techniques to evaluate all units (and immediately adjacent units and common areas)

---

[80] *Id.* at 8-9.

with more than one verified pest infestation over a twelve-month period.[81] Because NYCHA was behind in conducting the inspections and remediations of pest conditions required by the Consent Decree, the Federal Monitor directed NYCHA to focus on immediately providing relief to 2,645 units with open work orders. As a result, the Monitor's Second Report found that NYCHA has made progress in "clearing its backlog for the most severe pest category, interior rats," but "much work remains for other pest types."[82]

109.    The Monitor's Second Report also found that "NYCHA . . . needs to establish an overall pest management structure to guide NYCHA's pest relief strategy across its whole portfolio," and that "NYCHA currently has no inspectors to at a minimum confirm that IPM work was done as represented and . . . signs of pest activity are no longer present and that an infestation was eradicated."[83]

110.    NYCHA's failure to adequately address and remediate problems with pests poses a significant risk to the health and safety of the Plaintiffs and prospective Class Members.

I.    **NYCHA's Has Failed to Provide Adequate Waste Receptacles and Clean Common Areas**

111.    Under the Lease Agreements, NYCHA has an obligation "[t]o provide and maintain appropriate receptacles and facilities . . . for the deposit of garbage, rubbish and other waste removed from the premises." (Lease Agmt. § 13(f)) The Lease Agreements further require NYCHA to comply with the NYC Housing Code, which provides that NYCHA must "not allow the accumulation except in a lawful receptacle of . . . any type of waste matter in any part of the premises." N.Y.C. Admin. Code § 27-2022. The NYC Housing Code also states that a variety of

---

[81] Monitor's Second Report at 44.

[82] *Id.* at 5.

[83] *Id.* at 50-51.

substances, including building materials, boxes, and food, "which may afford harborage or provide food for such rodents or insects and other pests shall be kept stored or handled by [NYCHA]" in a manner to prevent the materials from attracting rodents or other pests. *Id*. § 27-2019.

112.    Additionally, the Lease Agreements require NYCHA to comply with the MDL, which requires NYCHA to "provide proper and suitable conveniences or receptacles for ashes, rubbish, garbage, refuse and other waste matter and shall arrange for the removal of such waste matter daily." MDL § 81(1). The MDL also requires that NYCHA "keep all and every part of a multiple dwelling, the lot on which it is situated, and the roofs, yards, courts, passages, areas or alleys appurtenant thereto, clean and free from vermin, dirt, filth, garbage or other thing or matter dangerous to life or health," and "keep clean at all times . . . every public or service part" of a multiple dwelling, "including every room, passage, stair, floor, window, door, wall, ceiling, water-closet or toilet compartment, cesspool, drain, hall and cellar in such public or service part." *Id*. §§ 80(1)-(2).

113.    Numerous NYCHA Developments have inadequate receptables for waste. A 2019 survey of residents in 217 NYCHA Developments found that half of all residents reported there were not enough places to throw out trash. More than half (56%) reported that trash chute doors were too small, damaged, or dirty, and nearly half (46%) reported that overflowing trash disposal locations were an issue.[84]

114.    In December 2018, when two trash compactors broke at the Sotomayor Development in the Bronx, huge piles of trash accumulated and sat rotting for days. NYCHA

---

[84] Public Works Partners, Trash Talk: Findings from Resident Waste Management Outreach (2019), *available at* https://www.publicworkspartners.com/wp-content/uploads/2019/04/Thrash-Talk.pdf.

took no action to remedy the problem until Bronx Borough President Ruben Diaz, Jr. posted a video of the problem on Twitter, which drew the attention of the news media. After the incident, a spokesperson for NYCHA told a local CBS News affiliate that NYCHA would "make sure it doesn't build up like this again."[85] But in August 2019, residents reported that trash was piling up outside of the Sotomayor Development once again.[86]

115.    Also in 2019, Washington Houses Residents Association President Claudia Perez wrote a letter to the Federal Monitor explaining that the Washington Development's trash compactors had been out of service for more than six months, and that workers were afraid to enter the compactor rooms to repair them for fear of being attacked by rats. The letter further stated that Residents continued to use the trash chutes even though the compactors were broken, which resulted in "garbage being filled all the way to the 14th floor of buildings." The Monitor's First Report stated that these conditions are indicative of "the magnitude of NYCHA's pest challenges across its portfolio."[87]

116.    When the News 12 Network reported on August 30, 2019 that a broken trash compactor at the Castle Hill Houses in the Bronx had caused a fly infestation, the Federal Monitor investigated and found that a backed-up sewer line had caused the compactor room to be flooded to "at least the seven-foot mark." Because one of the hopper doors was unsecured, the garbage chute had become filled with waste while the compactor was out of service. Although

---

[85] *Huge Garbage Pile at NYCHA Building Creates Awful Stench*, CBSN N.Y. (Dec. 30, 2018), https://newyork.cbslocal.com/2018/12/30/massive-pile-of-grabage-nycha-sonia-sotomayor- houses-bronx.

[86] Monica Morales, *Trash Piles Up at Bronx NYCHA Development*, PIX 11 NEWS (Aug. 8, 2019), https://pix11.com/2019/08/08/trash-piles-up-at-bronx-nycha-development.

[87] Monitor's First Report at 58; *see also id.* at App'x 6.

the garbage was eventually removed from the chute, it was then stored in the basement for several days, exacerbating the problem.[88]

117.    Similarly, in September 2019, after receiving a report from a resident, the Federal Monitor found that a compactor outage in a high-rise building had caused garbage to pile up in the chute to the seventh floor. The Federal Monitor also learned a fire later broke out near one of the chute doors and in the chute itself,[89] and that a work order relating to the outage was closed before any repairs were completed.

118.    After conducting these investigations, the Federal Monitor concluded: "It is obvious that NYCHA needs to develop a procedure for a timely response to compactor outages, as well as interim measures to protect residents from the hazards of accumulating trash."[90] The Monitor's Second Report also found that NYCHA did not meet an August 1, 2019 deadline to begin inspecting the grounds and common areas of each building in the NYCHA Developments at least once every 24 hours for cleaning and maintenance needs, including pests and trash, and remedy any deficiencies. As a result of NYCHA's failure to meet this obligation, in one notable incident, uncollected trash piled up in front of a playground.[91]

119.    The Monitor's Fifth Report Letter noted that in many Developments, there is still a "constant presence of all kinds of trash strewn about, including bulk garbage, which also promotes the added problem of pest infestations" and that each Development needs to develop "its own waste management action plan that takes into account each unique development

---

[88] Monitor's Second Report at 61; *see also Broken Compactor Leads to Bug Problem in Castle Hill Houses*, NEWS 12 (Aug. 30, 2019), http://bronx.news12.com/story/40987365/broken- compactor-leads-to-bug-problem-in-castle-hill-houses.

[89] Monitor's Second Report at 58.

[90] *Id.* at 59.

[91] *Id.* at 54-55.

building layout, the available waste management facilities (compactors, bulk garbage crushers, card board bailers, etc.), and provides clear directives as to how and where trash and recyclables should be disposed of at the development."[92]

120.    NYCHA residents often see cockroaches, mice, rats, and other pests in the common areas and around the exterior of their buildings, especially in locations near where trash is stored. NYCHA's failure to provide additional waste collection receptacles, collect waste from receptacles in a timely manner, and keep common areas clean poses significant risks to the Plaintiffs health and safety.

### J.    NYCHA Has Failed to Provide Gas

121.    The Lease Agreements provide that NYCHA "shall furnish without additional cost . . . gas and electricity in normal quantities." (Lease Agmt. § 10) Yet NYCHA often fails to provide gas to the Residents and does not respond to their requests for gas service in a timely manner, when it responds at all. In one incident, approximately sixty families in the Red Hook Developments had their gas turned off. Despite repeated requests from the families, NYCHA did not restore the families' gas service for three months.[93] The same has happened to the tenants in 401-409 West 19th Street in the Fulton Houses, where it took three months and litigation to get gas restored.

122.    NYCHA's failure to provide gas service to those families also provided further evidence of the inadequacy of the electrical systems in the NYCHA Developments. Although the

---

[92] Monitor's Fifth Report Letter at 6.

[93] *See* Scott Enman, *After Months Without Gas, Red Hook NYCHA Residents Demand Reimbursement*, BROOKLYN DAILY EAGLE (June 10, 2019), https://brooklyneagle.com/articles/2019/06/10/after-months-without-gas-red-hook-nycha-residents-demand-reimbursement.

families were provided with hot plates, the hot plates could not cook meals large enough for the families, and those who tried to use more than one hot plate blew the fuses in their units.[94]

123.     Residents in several other NYCHA Developments have faced similar gas outages. In May 2019, Residents of at least three buildings in the Marble Hill Development in the Bronx lost gas service for more than a month.[95] In August 2019, over 110 families at the Coney Island Development in Brooklyn were also without gas service for more than a month.[96] Of course, without gas to cook meals for themselves and/or their families, the Plaintiffs and other Residents must spend precious resources to order takeout or eat out.

**K.     NYCHA's Has Failed to Make Necessary Repairs At All or Within a Reasonable Period of Time**

124.     In addition to the specific provisions discussed above, the Lease Agreements impose a general obligation on NYCHA "[t]o make necessary repairs to the Leased Premises." (Lease Agmt. § 13(c)) The Lease Agreements also provide that if the "Leased Premises is damaged to the extent that conditions are created which are hazardous to life, health, or safety of the occupants," NYCHA "shall repair the Leased Premises within a reasonable time." (*Id.* § 14(b)).

125.     The Lease Agreements further provide that "in circumstances where necessary repairs cannot be made within a reasonable time," NYCHA "shall offer standard alternative accommodations, if available." (*Id.* § 14(c)) The Lease Agreements then provide that if repairs are not made and alternative accommodations are not provided, "the rent shall abate during the

---

[94] *Id.*

[95] Monica Morales, *Multiple Bronx NYCHA Buildings Haven't Had Gas for Weeks: Residents*, PIX 11 NEWS (May 11, 2019), https://pix11.com/2019/05/08/multiple-bronx-nycha-buildings- havent-had-gas-for-weeks-residents.

[96] Steven Klett, *Frontus, Tenants Anger Boils Over at NYCHA Gas Outage*, KINGS CNTY. POLITICS (Sept. 18, 2019), https://www.kingscountypolitics.com/frontus-tenants-anger-boils-over-at-nycha-gas-outage.

period exceeding a reasonable time for repairs in which such repairs were not made, in proportion to the seriousness of the damage and loss in value as a dwelling."[97] (*Id.* § 14(d))

126.    As discussed in detail above, NYCHA routinely fails to respond to the Plaintiffs and other Residents' requests for necessary repairs and does not make repairs within a reasonable time. NYCHA also fails to offer the Plaintiffs or other Residents any alternative accommodations or allow their rents to abate during the period in which repairs were not made. Publicly available data on NYCHA's website indicates that from September 2018 to September 2019, the number of days required to make repairs in the NYCHA Developments has more than doubled—from 62 days to 127 days—and is well above NYCHA's target of 15 days.[98]

127.    The data on NYCHA's website also indicates that the number of open work orders in the NYCHA Developments has increased by 42 percent—from 223,610 in September 2018 to 319,750 in September 2019. In every month from September 2018 through September 2019, the number of work orders opened in the NYCHA Developments was greater than the number that were closed or cancelled. At the June 2019 Hearing, one NYCHA resident testified that although she had put in several work orders, she had been waiting for her closet, sink and toilet to be fixed for more than two years. This situation only worsened during the Pandemic.

128.    Moreover, it is likely that the publicly available data on NYCHA's website understates the scope of unresolved problems in the NYCHA Developments. The Monitor's First

---

[97] A rent abatement is an appropriate form of relief for these and other breaches of Plaintiffs' and other Residents' leases. *See, e.g.*, *VBH Luxury Inc. v. 940 Madison Assocs., LLC*, 2011 WL 6891584, at *1 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 13, 2011) (noting that plaintiff had "established prima facie that the defendant breached the lease in failing to maintain the [leased property]," and "[s]hould a breach be established, plaintiff would be entitled to recover monetary damages representing any diminution in the value of its leasehold, as a function of the rent set forth in the lease, arising out of such breach") (citing *Logan Advisors, LLC v. Patriarch Partnres, LLC*, 63 A.D.3d 440, 443 (1st Dep't 2009)).

[98] NYCHA Metrics, N.Y.C. HOUS. AUTH.,
https://eapps.nycha.info/NychaMetrics/Charts/PublicHousingChartsTabs/?section=public_housing&tab=tab_repairs (last visited Oct. 7, 2019).

Report "found that NYCHA's data is often incomplete, imprecise, and/or inaccessible, creating

an inaccurate perception of NYCHA's performance" and that "often there is little, if any,

correlation between closing work orders and completing the repair of a problem."

129.    NYCHA's repeated failure to respond to Plaintiffs and other Residents' requests

for repairs in a timely manner, if at all, poses a serious danger to the health and safety of the

Plaintiffs.

## III.    **NYCHA PACT/RAD Program Undercuts NYCHA Tenants' Rights**

### A.    **Description of the PACT RAD Program**

130.    In Baez v. NYC Housing Authority, ----F.Supp. 3d----, 2021 WL 1371793

(SDNY April 12, 2021) US District Judge William Pauley described the PACT/RAD program

as follows:

> Section 8 vs. Section 9 Housing
>
> The United States Department of Housing and Urban
> Development ("HUD") administers two major low-income
> housing programs that fund NYCHA Section 8 and Section 9.
> (Decl. of Gregory Russ in Opp'n to Mot. to Enforce, ECF No. 305
> ("Russ Decl."), ¶ 5.) The Housing Act of 1937, 42 U.S.C. § 1437
> et seq., provides Section 9 federal funding for publicly owned and
> operated housing units. (See Russ Decl., ¶ 6.) The Housing and
> Community Development Act of 1974, 42 U.S.C. § 5301 et seq.,
> provides Section 8 federal funding in the form of vouchers to low-
> income families who may subsidize their rent in privately owned
> and operated housing units. (See Russ Decl., ¶ 7.)
>
> In 2012, HUD launched the Rental Assistance
> Demonstration program ("RAD") funded by Section 8. (Russ
> Decl. - 18.) Instead of a voucher system for tenants, RAD
> disburses funding to public housing authorities to enter into
> long-term leases with private developers.
>
> Under RAD, HUD still subsidizes the tenants' rent
> payments and the local housing authority provides a subsidy to
> the developer. Developers renovate housing authority-owned
> properties with their own capital, and retain private property
> management companies to operate the developments. (See Russ

Decl., ¶ 18.) To utilize RAD funds, NYCHA launched the Permanent

Affordability Commitment Together ("PACT") program in May 2015. (Russ Decl., ¶ 25.) Under the PACT program, NYCHA continues to own its housing portfolio but leases its buildings to private developers, who in turn renovate them and manage day-to-day operations.

Transfer to PACT

On May 19, 2015, NYCHA announced its first PACT project. (Russ Decl., ¶ 28.) As part of that project, NYCHA converted its Ocean Bay Apartments in Far Rockaway, Queens-totaling 1,395 units-from a NYCHA-operated Section 9 development to a PACT funded Section 8 development. (Russ Decl., ¶ 28.) In January 2017, NYCHA announced that it would convert 1,700 additional units in Brooklyn and the Bronx to PACT housing. (Russ Decl.- 32.). On November 19, 2018-eleven days before this Court "so ordered" the Revised Consent Decree-NYCHA announced its intention to transition one-third of its housing portfolio- approximately 62,000 units-to PACT. (See Decl. of Erin M. Meyer in Supp. of Mot. To Enforce, ECF No. 295, Ex. B.)

As of February 3, 2021, 9,517 units-approximately 5% of NYCHA's housing portfolio-have been converted to PACT. (ECF No. 319, at 1-2.) NYCHA plans to transfer an additional 12,000 units to PACT by the end of 2022. (ECF No. 319, at 2.)

## B.    Loss of Tenants' Rights Under RAD/PACT

131.    In the *Baez* case NYCHA took the position that the protections of the mold

Consent Decree were not applicable to RAD/PACT apartments. *Baez, supra, at \*7.* And Judge

Pauley agreed, and refused to enforce the consent decree in buildings which had been transferred

to PACT/RAD.

132.    It also seems clear that the HUD-NYCHA Agreement (Exhibit B) also does not

apply to PACT/RAD conversions. See paragraphs 14 and 15 of the agreement:

14. The obligations of this agreement apply to apartment units, common areas, residential buildings, and building sites consisting of public housing owned or operated by NYCHA and receiving funding through Section 9 of the Housing Act.

15. If, due to a conversion program an apartment unit, common area, residential building, or building site is no longer operated by NYCHA and receiving funds through Section 9 of the Housing Act, then the obligations of this agreement shall no longer apply as to those conversions as of the closing of the applicable transaction…

133.     At Harlem River Houses, where all of the plaintiffs reside, the lease they are being asked to sign, annexed as Exhibit C, does not contain all of the protections of the NYCHA lease (Exhibit A) and the tenants have none of the statutory protections set forth in Section 9 of the Housing Action of 1937, protections which are sweeping in their scope, far more sweeping than the PACT/RAD lease which Plaintiffs are being asked to sign. For example, the Lease Agreement imposes a general obligation on NYCHA "[t]o make necessary repairs to the Leased Premises." (Ex. A Lease Agmt. § 13(c)) The Lease Agreement also provides that if the "Leased Premises is damaged to the extent that conditions are created which are hazardous to life, health, or safety of the occupants," NYCHA "shall repair the Leased Premises within a reasonable time." (*Id.*§ 14(b)) The Lease Agreements further provide that "in circumstances where necessary repairs cannot be made within a reasonable time," NYCHA "shall offer standard alternative accommodations, if available." (*Id.* § 14(c)) The Lease Agreements then provide that if repairs are not made and alternative accommodations are not provided, "the rent shall abate during the period exceeding a reasonable time for repairs in which such repairs were not made, in proportion to the services not provided.

134.     NYCHA has pointed to the PACT/RAD program, up to now, as the only means by which it could raise the capital funds to do the $40 billion in repairs that it estimates need to be done to make the Section 9 housing livable. The PACT program, in essence, gives developers the right to build additional apartment buildings (containing mostly market rate apartments) on open spaces in the NYCHA developments, as long as they become Section 8 landlords and

undertake repairs. Under Section 8 the tenants receive vouchers from the government which they give to the landlord, which gets paid whatever the tenants don't pay (tenants pay 30% of their income at most). The sums paid to the landlord under Section 8 exceed what HUD gives to NYCHA per apartment.

135.    In March 2021 President Biden announced a $1.9 billion infrastructure expenditure proposal, called the American Jobs Plan (https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/31/fact-sheet-the-american-jobs-plan/) which included $40 billion to repair public housing. See https://www.usatoday.com/in-depth/news/politics/2021/04/01/2-trillion-infrastructure-bill-charts-detail-bidens-plan/4820227001/).

136.    On April 18, 2021, following a discussion with counsel for the Plaintiffs herein, and others, Senate Majority Leader Charles Schumer announce that he would amend the legislation when it came to the Senate and that Representative Nydia Velazquez would do the same when the legislation came to the House of Representatives, to make the public housing allocation $80 billion, so as to make sure that NYCHA's full capital needs were met. See https://www.schumer.senate.gov/newsroom/press-releases/schumer-nycha-and-its-residents-face-now-or-never-moment-for-critically-needed-investments-via-american-jobs-plan-but-plans-call-for-40-billion-for-the-whole-nation-is-just-not-enough-senator-fights-to-double-proposal-for-public-housing_nycha-to-at-least-80-billion, and see https://www.facebook.com/watch/live/?v=169793755010302&ref=watch_permalink.

137.    On April 23, 2021 Plaintiffs' counsel, Arthur Schwartz, wrote to NYCHA Chairman Greg Russ (see Exhibit D) discussing the developments with the infrastructure legislation, and the ruling by Judge Pauley in *Baez.* The letter asserted that PACT/RAD leases

diminished NYCHA tenants' rights and asked Chairman Russ to freeze the PACT/RAD program until Congress acted.

138.    Chairman Russ responded on April 28, 2021 (Exhibit E). He stated that the private leases under Section 8 did not diminish anyone's rights, and asserted (incorrectly) that we had misconstrued Judge Pauley's decision in *Baez*, and that Judge Pauley had found that PACT residents were covered by the *Baez* consent decree (which was contrary to the position NYCHA asserted to Judge Pauley). While Chairman Russ applauded the possible Congressional allocation he made it clear that it would "complement PACT." He concluded the letter by stating, "In the meantime NYCHA must use the tools currently available from the federal government to give our residents the safe, healthy and permanently affordable home they deserve."

139.    At Harlem River Houses C&C Apartment Management continued to push NYCHA tenants to sign their leases. They visited tenant's apartments, asking to take a survey so that they could plan repairs, and, in other cases, contacting tenants telling them that they would face eviction of they didn't sign leases.

140.    There is no question that NYCHA intends to continue the PACT/RAD program so that it can eschew all responsibility to run the NYCHA developments, and convert the entire NYCHA property into privately owned Section 8 housing.

## FIRST CAUSE OF ACTION
### (Breach of the Lease Agreements)

141.    The Plaintiffs repeat and re-allege Paragraphs 1 through 140 of this Complaint as if fully set forth herein.

142.    Plaintiffs have a property interest in the rights they have as Section 9 tenants, in the continuation of their leases with NYCHA, and in the settlement agreements entered into to settle *USA v NYCHA* and *Baez v NYCHA*.

143.     By requiring Plaintiffs, and the class they represent, to forfeit these property interests with due process Defendant has violated Plaintiffs' and their class' rights under the 5th and 14th Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
### (Arbitrary & Capricious Administrative Action)

135.     The Plaintiffs repeat and re-allege Paragraphs 1 through 143 of this Complaint as if fully set forth herein.

136.     As Defendant's administrative decision to continue to pursue the PACT/RAD program despite the likely grant of $40 billion in funding by the Federal Government, in light of the negative consequences for NYCHA tenants, is arbitrary and capricious.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray that this Court:

a.      Enter a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction prohibiting Defendant from taking actions to force or require Plaintiffs and the class they represent to sign leases with C&C Apartment Management LLC, or any other PACT/RAD developer/management participant, unless Congress fails to allocate necessary capital funds to NYCHA as part of the American Jobs Plan.

b.      Award the Plaintiffs' counsel reasonable attorneys' fees and costs; and

c.      Grant such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        June 2, 2021

                                ADVOCATES FOR JUSTICE
                                Attorneys for Plaintiffs

                                By:_____*Arthur Z. Schwartz*_____
                                        Arthur Z. Schwartz
                                225 Broadway, Suite 1902
                                New York, New York 10007
                                (212) 285-1400
                                aschwartz@afjlaw.com

## <u>VERIFICATION</u>

ARTHUR Z. SCHWARTZ, an attorney at law duly admitted to the Bar of the State of New York, deposes and says: I am counsel to Plaintiffs. I have read the Complaint, and the same is true to my knowledge, information, and belief. My knowledge is gained from interviews with the Plaintiffs, visits to their residences, review of Court filings and reports, and review of records provided by the Plaintiffs.

Dated: June 2, 2021

/s/ *Arthur Z. Schwartz*

ARTHUR Z. SCHWARTZ